IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| DEREK M. FLEENER, | ) | |
| | ) | |
| Plaintiff | ) | Civil No. 08-6353-HU |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MICHAEL A. HALLIDAY
Mills Jacobson Halliday, PC
715 Commercial St. NE
Salem, OR 973041

      Attorney for Plaintiff

KENT ROBINSON
Acting United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

DAPHNE BANAY
Special Assistant U.S. Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 901
Seattle, WA 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff Derek Fleener ("Fleener") seeks judicial review of the Social Security Commissioner's final decision denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). This court has jurisdiction under 42 U.S.C. § 405(g).

    For the following reasons, I recommend the Commissioner's decision be AFFIRMED.

## PROCEDURAL BACKGROUND

    Born in 1963 (Tr. 69), Fleener reports completing two years of post-secondary education (Tr. 84)[1] and work as an automotive detailer between 1978 and December 2000. Tr. 79.

    Fleener applied for DIB on December 15, 2000. Tr. 69. Fleener also applied for DIB a second time (Tr. 941-43), as well as SSI, on April 21, 2004. Tr. 933-35. Fleener alleges disability since December 20, 1999. Tr. 69, 933, 941. At this time Fleener was thirty six. He initially alleged disability in 2000 due to back and hand injuries and surgeries, a heart attack, and "post-operative depression." Tr. 78. In 2004, Fleener stated that he was disabled due to "broke back/ heart attack/ paracarditis [sic], depression, mental, no spleen, persistent pneumonia, migraines." Tr. 947.

    The Commissioner denied all of Fleener's applications initially and upon reconsideration.

---

[1]Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer (Docket #11).

2 - FINDINGS AND RECOMMENDATION

Tr. 57-61; 894-899; 905-922.  An ALJ held a hearing on October 23, 2003 (Tr. 1484-1507), at which Fleener declined representation.  Tr. 1488.  The ALJ subsequently found Fleener not disabled on February 24, 2004.  Tr. 873-80.  The Appeals Council remanded the matter back to the ALJ on October 19, 2006, for consideration of additional evidence submitted to the Appeals Council, further evaluation of Fleener's mental impairments, further consideration of Fleener's RFC, further vocational expert testimony, and, if necessary, a medical expert's testimony. Tr. 849-50.  A different ALJ held a second hearing, on March 12, 2007 (Tr. 1508-23), and again found Fleener not disabled on June 7, 2007.  Tr. 24-35.  The Appeals Council denied Fleener's request for reconsideration, and the ALJ's June 2007 decision became the Commissioner's final decision on September 9, 2008.  Tr. 11-13.

## FACTUAL BACKGROUND

I.    **Medical Evidence**

The 1,523 page record before this court documents Fleener's medical treatment between December 1999 and January 4, 2007.

A.    **1999**

On  December 20, 1999, Fleener sought emergency room treatment for foreign bodies in his left hand, reporting that he fell into a thorny plant and subsequently injured his hand.  Tr. 169.  X-rays showed no abnormalities or foreign bodies at this time.  Tr. 168, 1075, 1077.

On December 25, 1999, emergency room physicians diagnosed left hand cellulitis due to retained thorns in the hand.  Tr. 133, 135.  Fleener was admitted to the hospital (Tr. 1067) and underwent general anesthesia for surgical removal of these thorns on December 27, 1999.  Tr. 134, 1066.  The concurrent December 27, 1999, pathology report showed that surgeons extracted a

3 - FINDINGS AND RECOMMENDATION

"splinter" from Fleener's hand.  Tr. 1076.

**B.    2000**

Treating physician Dr. Allen reported that Fleener claimed he could not move his hand on January 6, 2000.  Tr. 184.  Dr. Allen found "no sign whatsoever of infection" at this time." *Id.*  On January 18, 2000, surgeons performed a left carpal tunnel release procedure on Fleener's left hand, and again reported negative exploration for foreign bodies.  Tr. 152; 1064.  Dr. Allen noted that Fleener "seemed to think he is much better" on January 25, 2000.  Tr. 184.

On February 17, 2000, Dr. Allen wrote that Fleener reported numbness in his entire left arm, and that Fleener's lack of compliance with treatment was "unacceptable." Tr. 185.  Dr. Allen also wrote that he could not rely upon physical examination of Fleener at this time, and that Fleener's reported left hand stiffness was due to lack of use rather than acute pathology.  *Id.*  March 6, 2000, motor nerve conduction studies of Fleener's wrists were normal.  Tr. 16-48.  Fleener again underwent surgery to remove thorns in his hand on March 7, 2000.  Tr. 151, 185.  On March 21, 2000, treatment notes indicate that the March 7, 2000, exploratory surgery for foreign bodies was "negative." *Id.,* Tr. 1063.

On March 11, 2000, treating physician Dr. Dr. Sabo[2] followed up regarding Fleener's reported emergency room visit due to a reported "heart attack."  Tr. 204.  Fleener was discharged from Legacy Good Samaritan Hospital following treatment of left hand cellulitis on March 13, 2000.  Tr. 1068.

Fleener was admitted to Legacy Good Samaritan Hospital between April 28, 2000, and May 1, 2000.  Tr. 1061.  An April 28, 2000, chest X-ray showed no pneumonia or heart failure.  Tr. 1074.

---

[2]Dr. Sabo's chart notes are unsigned.  Tr. 193-205.

4 - FINDINGS AND RECOMMENDATION

His discharge diagnosis was fever of unknown source, which was resolving. *Id.*

On May 1, 2000, Fleener was admitted to Emanuel Hospital for an unknown bacterial infection producing acute illness with fevers, nausea, and vomiting. Tr. 170. Fleener reported upon admission that he had experienced five days of acute illness. *Id.*

On May 11, 2000, Dr. Sabo diagnosed right-side phlebitis and a history of endocarditis, based upon Fleener's report. Tr. 205.

Fleener requested physical therapy for his left hand on May 22, 2000, from treating physician Dr. Allen, who found such treatment unwarranted. Tr. 183. On May 24, 2000, Fleener complained of right arm and chest pain, and treating physician Dr. Sabo stated that angina should be ruled out. Tr. 201-02. The record does not show this was ever done. At any rate no record supports a diagnosis of angina thereafter.

Fleener visited the Emergency Room on May 31, 2000, complaining of back pain and left hand pain. Tr. 1058. He was discharged with a "low back pain" diagnosis. Tr. 1059.

Fleener complained of back pain, left-side chest pain, and left hand numbness on June 8, 2000. Tr. 197, 199. Dr. Sabo diagnosed lumbar strain with back pain, and suggested a rule-out diagnosis of a fractured cocyx. Tr. 198. Also on June 8, 2000, Dr. Sabo diagnosed lower back pain due to arthritic changes with no evidence of fracture. Tr. 213. An X-ray on June 8, 2000, showed trace spurring of the lumbar vertebrae and bridging at T12-L1. Tr. 1102. A June 9, 2000, X-ray was negative for pathology except for mild arthritis. Tr. 195. At this time Fleener reported difficulty standing and increased pain with sitting. *Id.* Dr. Sabo diagnosed "lumbar myotis"[3] on June 19,

---

[3]"Myotis" refers to inflammation of muscle tissue. Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* ( 5th ed. 1998).

2000.  Tr. 196.

On July 16, 2000, Dr. Sabo diagnosed lower back pain with radiculopathy.  Tr. 194.  A July 18, 2000, MRI showed that Fleener had "broad disc herniation" at L5-S1, which impacted the left S1 nerve root.  Tr. 212.  At this time Fleener reported bilateral leg pain.  Tr. 247.

Neurosurgeon Dr. Brett wrote a "possible future [hospital] admission note" on July 31, 2000. Tr. 216.  Dr. Brett wrote that, by Fleener's report, his back pain began when he fell into a thorn bush on December 20, 1999.  Tr. 216.  On August 14, 2000, Dr. Brett performed an "extensive lumbar laminectomy, total facetectomy, foraminotomy and removal of pedicle bilateral L5-S1, bilateral disectomy and bilateral L5-S1 posterior lumbar interbody fusion."  Tr. 224-25.  Fleener was discharged from the hospital on August 17, 2000.  Tr. 219.  On September 15, 2000, Dr. Brett wrote that Fleener reported much of his pain had resolved following surgery.  Tr. 244.  Dr. Brett released Fleener to work on September 15, 2000, with a twenty-five pound lifting restriction.  Tr. 1052.  Dr. Brett refused Fleener's request for stronger pain medication on November 22, 2000.  Tr. 243.  On December 6, 2000, Dr. Brett again released Fleener to work, this time with a thirty-five pound lifting restriction.  Tr. 1052.  At this visit Fleener reported that he "has been labeled totally disabled."  Tr. 242.  Concurrent X-rays showed normal post-operative changes.  Tr. 1098.

Fleener had a normal chest X-ray on August 11, 2000.  Tr. 206-07.

Examining psychologist Dr. Bryan evaluated Fleener on September 21, 2000.  Tr. 228-39. Dr. Bryan based his opinion on a clinical interview and testing, and diagnosed a pain disorder and a major depressive disorder.  Tr. 233.  Dr. Bryan recommended that Fleener attend a pain rehabilitation program, and assessed his prognosis as "guarded to poor."  *Id.*

Amy Cannon, identified by the record as a "Qualified Mental Health Professional," evaluated

Fleener following his self-referral on October 26, 2000. Tr. 251-53. Cannon diagnosed adjustment disorder and assessed a global assessment of functioning ("GAF") score of 60. Cannon saw Fleener again on November 17, 2000. Tr. 255. On December 19, 2000, Cannon noted that Fleener did not show for an appointment. Tr. 254. Cannon left Fleener a message on January 2, 2001, asking him to notify her if he no longer needed mental health services. *Id.* On January 25, 2001, Cannon sent Fleener a letter "stating that if I did not hear from him by 2/8/01 I would close his file." *Id.* Finally, on February 1, 2001, Cannon noted that Fleener called in response to her letter, and provided excuses for failing to attend his appointments. *Id.* At this point Cannon and Fleener agreed that they would speak on the phone in two weeks. *Id.* The record contains no further notes from Cannon regarding Fleener.

### C.    2001

Fleener sought emergency room care for a headache on January 10, 2001. Tr. 1054-55. He received Tylenol and Phenergan and was discharged with advice to follow up with his primary care physician. Tr. 1055.

In April 2001, Fleener reported chronic lower back pain, and was referred for a neurological consultation. Tr. 1092. The record does not include a neurological evaluation on or near that date.

Fleener presented at an urgent care center on April 30, 2001, reporting that he had a headache lasting three weeks. Tr. 1348. Attending physicians diagnosed headache and administered Stadol and Phenergan injections. Tr. 1348-49.

Fleener reported a splinter and lesion in his foot at the emergency room on June 12, 2001. Tr. 398. He was found to have warts, and was advised to contact his primary care physician for removal. Tr. 398.

Fleener sought urgent care treatment for a headache on November 2, 2001.  Tr. 395, 1347. On September 13, 2001, Oregon Health Sciences University neurologist Dr. Burchiel assessed Fleener.  Tr. 1086-87.  Dr. Burchiel could find no explanation for Fleener's reported bilateral lower extremity sensory loss, and found "some evidence of functional features" in Fleener's presentation. Tr. 1087.  Dr. Burchiel attributed Fleener's reported neurological  symptoms to stress and anxiety. *Id.*

**D.    2002**

A January 15, 2002, EMG showed "no electromyography evidence for a lumbarsacral radiculopathy or neuropathy in either lower extremity."  Tr. 1088.  On January 22, 2002, Dr. Burchiel stated that he had no follow-up plan for treating Fleener, and recommended against any invasive procedures.  Tr. 1085.

Fleener presented at the emergency room on April 22, 2002, and received a diagnosis of pneumonitis.  Tr. 1343.  His white blood cell count was 17,700, and he was triaged to the emergency room for further labs.  *Id.*

Fleener again presented at the emergency room the next day, on April 23, 2002, reporting that he felt sick and again received a diagnosis of pneumonitis.  Tr. 401-02.  On April 27, 2002, Fleener relayed a history of "heart attack," which attending physician Dr. Strand felt was most likely endocarditis.  Tr. 405.  On April 30, 2002, Fleener presented, without an appointment, at his treating physician Dr. Leopold's office stating that he had recently been hospitalized.  Tr. 1090.  Dr. Leopold stated that his review of hospital records did not show any recent hospitalization, and that no evidence supported Fleener's reports of a white blood cell count of 20,000, a fever of one hundred and six degrees, pneumonia, or receipt of IV antibiotics.  Tr. 1090.  An April 30, 2002, chest X-ray

was normal.  Tr. 1094.

**E.    2003**

Fleener established care with a new treating physician, Dr. Gillipse, on February 7, 2003.

Tr. 281.  Here he complained of lower back pain, which he said originated when he fell into a

"sticker bush" in 1999.  *Id.*  Fleener also relayed that he had "up to forty of the stickers in his left

arm" and received six surgeries on that arm.  *Id.*  Dr. Gillipse diagnosed lower back pain with

radiculopathy, and stated that Fleener is "currently disabled."  Tr. 282.  Dr. Gillipse also noted

Fleener's reported history of endocarditis and fatigue.  Dr. Gillipse administered B12 shots for

Fleener's fatigue on March 7, 2003, and continued to diagnose lower back pain with radiculopathy.

Tr. 283.

Fleener was assessed for reported cardiac pain on March 14, 2003.  Tr. 284.  A twenty-four

hour Holter monitor study showed no significant artifact.  *Id.*  Fleener was admitted to Salem

Hospital on March 16, 2003.  Tr. 351.  A March 17, 2003, echocardiogram showed "no clear

findings of pericarditis," and the technician concluded, "it is difficult to make that diagnosis on this

basis."  Tr. 351.  A brain MRI on the same date showed no abnormalities.  Tr. 302, 368.  A chest X-

ray on March 19, 2003, was normal (Tr. 300-01, 369), and a CT study of Fleener's abdomen showed

gas only.  Tr. 364, 367, 429.  A head CT was normal on this date also.  Tr. 303, 366.  Physicians also

performed a lumbar puncture on March 20, 2003, without any attached results in the record before

this court.  Tr. 363.  Fleener was discharged on March 22, 2003 with diagnoses of pneumonitis and

a febrile illness.  Tr. 344.

On April 18, 2003, a physician noted Fleener's reported history of pericarditis.  Tr. 285.

Fleener presented at the Emergency Room on April 27, 2003, complaining of a headache, and

received a headache diagnosis "by history." Tr. 1122. A chest X-ray on this date was normal. Tr. 1121. Fleener again presented to the Emergency Room on April 28, 2003, and received diagnoses of "bronchitis versus pneumonia" and headache. Tr. 1120. Physicians stated that they would not prescribe Fleener Vicodin. Tr. 1120.

Fleener presented to Salem Hospital Emergency Room on May 16, 2003, reporting vomiting. Tr. 431. A CT examination suggested a small bowel obstruction with no evidence of an unspecified "congestive failure." Tr. 299. A separate CT showed no evidence of a urethral stone. Tr. 431. On May 21, 2003, Fleener received diagnoses of ataxia, lower back pain, and abdominal pain. Tr. 287.

Fleener presented at the Emergency Room on July 15, 2003, complaining of abdominal pain, but physicians could find no signs of an acute condition. Tr. 384. On July 17, 2003, Dr. Gillipse found Fleener's reports of abdominal pain and early satiety[4] "unclear." Tr. 289. Fleener again presented at the emergency room on July 18, 2003, and attending physician Dr. Novoa diagnosed back pain. Tr. 1335. A gallbladder study on August 25, 2003, was normal (Tr. 296, 1337), as was a hepatobiliary study conducted on the same date. Tr. 296, 383. An MRI was also performed on August 25, 2003, which showed post-operative changes at L5-S1, a minimal amount of scar tissue, no apparent displacement of the nerve root, moderate right foraminal stenosis, mild left foraminal stenosis, and very minimal disc desiccation at L4-L5. Tr. 382. Fleener also had a normal chest X-ray and CT on September 17 and 18, 2003, which showed no pericardial abnormalities. Tr. 297-98.

Fleener presented to the Emergency Room on September 17, 2003. Tr. 372. Physicians noted Fleener's "dramatic presentation" and stated that his behavior changed when witnesses were

---

[4]Satiety refers to the "feeling of being full after eating." Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* ( 5th ed. 1998).

present. Tr. 372. A chest X-ray was normal and showed no evidence of cardio-pulmonary disease. Tr. 374. Emergency room physicians diagnosed bronchitis and pleurisy, and sent him home. Tr. 372, 1332. The next day, on September 18, 2003, Fleener was admitted to Salem Hospital for shortness of breath, fever, chills, and nausea. Tr. 324, 436, 439, 1301-03. Attending physician Dr. Bong noted that Fleener was diagnosed with bronchitis the preceding day, and diagnosed "fevers," writing that Fleener's immediate bronchitis history "would favor upper respiratory bacterial [infection] versus viral illness." Dr. Bong concluded that, "there is no physical or historical evidence at this point to a hardware infection. Also in the differential would include a collagen vascular sources and elevated ESR." Tr. 441. An echocardiogram at this time was normal. Tr. 340.

On September 23, 2003, Dr. Gillipse found that Fleener had a Du Puythen's[5] contracture of his right hand, a fever second to viral pharyngitis, and chest wall pain from costochondritis. Tr. 292, 1299. Dr. Gillipse recommended ice for Fleener's chest wall pain. *Id.*

Dr. Gillipse noted Fleener's report of increased back pain on October 20, 2003, with S1 radiculopathy. Tr. 294. Dr. Gillipse repeated this notation on October 30, 2003. Tr. 321. Fleener received an epidural steroid injection on November 10, 2003, after complaining of lower back pain with pain and numbness in his legs and feet. Tr. 444, 447-78.

Fleener presented at Salem Hospital on November 10, 2003, complaining of low back pain and pain and numbness in his legs and feet. Tr. 1286, 1479-82. Attending physician Dr. Anderson took Fleener's report that his original injury resulted from tripping on a curb, and subsequently

---

[5]DuPuythen's contracture is a "progressive painless thickening and tightening of subcutaneous tissue of the palm, causing the forth and fifth fingers to bend into the palm and resist extension. Tendons and nerves are not involved."  Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* ( 5th ed. 1998).

11 - FINDINGS AND RECOMMENDATION

falling into a thorn bush while training for a triathalon in 1999. Tr. 1286. Dr. Anderson diagnosed lower back pain with suggested bilateral S1 radiculopathy. Tr. 1288. Dr. Anderson subsequently recommended and administered an epidural steroid injection. *Id.*, Tr. 1289-90.

A November 17, 2003, MRI, following Fleener's report of right-side back pain, showed "some" stenosis. Tr. 293. A chest X-ray on November 18, 2003, was normal. Tr. 295.

Fleener presented to the Emergency Room on November 24, 2003, and received a diagnosis of chronic lower back pain. Tr. 1119.

Fleener again presented to the Emergency Room on December 2, 2003, and stated "I think I'm dying." Tr. 1118. Physicians diagnosed chronic pain and concluded that "patient has no complaints tonight that are new or different from his complaints of the last four years as near as I can tell." *Id.* On December 9, 2003, Fleener presented to the Emergency Room complaining of abdominal pain (Tr. 1116) and received a diagnosis of "severe epigastric pain, nausea and vomiting." Tr. 1117. The attending physician also wrote, "rule out possibility of gastric or peptic ulcer disease." *Id.*

### F.    2004

Fleener reported exertional chest pain to treating physician Dr. Reznik on January 6, 2004. Tr. 1387. A January 16, 2004, abdominal CT scan showed no acute pathology. Tr. 1125. Fleener presented at Salem Memorial Hospital on January 23, 2004, and attending physician Dr. Keirstead diagnosed hematochezia[6] and recurrent vomiting. Tr. 1129. On January 26, 2004, Dr. Kierstead

---

[6] Hematochezia is the passage of red blood through the rectum, usually caused by bleeding in the colon or rectum. It may also be caused by blood loss higher in the digestive track. Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* (5th ed. 1998).

performed an esophagogastroduodenoscopy and colonoscopy, and diagnosed moderate duodenitis, duodenal ulcers, and proctitis.  *Id.*

Fleener's fiancé referred Fleener to psychiatrist Dr. Suckow on February 27, 2004.  Tr. 1138. Fleener told Dr. Suckow that he was concerned that he had bipolar disorder or attention disorder. *Id.*  Fleener also reported to Dr. Suckow that he had been hospitalized thirty times following a "major accident," and that he attended Pepperdine University.  *Id.*  Dr. Suckow diagnosed Fleener with mood disorder secondary to a back injury and chronic pain syndrome on February 27, 2004, noting Fleener's report of a "failed" fusion operation in 2000.  Tr. 1138.  Dr. Suckow also diagnosed depression on March 18, 2004, March 31, 2004, and April 19, 2004.  Tr. 1132, 1137.  Dr. Suckow indicated, without explanation, that he closed Fleener's file on June 1, 2004.  Tr. 1134.

Fleener presented at an Urgent Care center February 25 and March 6, 2004, and attending physician Dr. Buckingham diagnosed chronic low back pain.  Tr. 1330-31.  On April 27, 2004, treating physician Dr. Collada noted that Fleener objected to Dr. Collada entering a note in his record stating that no medical evidence supported Fleener's claims that he had a heart attack.  Tr. 1141.

Dr. Reznik performed a new patient evaluation on Fleener on March 11, 2004.[7]  Tr. 1414. Each of Dr. Reznik's chart notes for subsequent visits include a duplicated word-processed heading that characterized Fleener "with" failed back surgery syndrome, chronic back pain, peptic ulcer disease ("PUD"), asplenia, fibromyalgia, bipolar disorder, depression, and erectile dysfunction.  *Id.* Dr. Reznik did not explicitly diagnose each of these impairments or make specific clinical findings

---

[7]The record shows that Dr. Reznik first saw Fleener two months earlier, on January 6, 2004.  Tr. 1387.

regarding each impairment.[8]  The record shows that, between March 2004 and January 2007, Dr.

Reznik made "assessments" of smoking (Tr. 1377, 1412, 1455, 1457), hallucinations and psychotic

symptoms (by report), hypertriglyceridemia (Tr. 1377), chronic pain syndrome (Tr. 1379, 1381,

1385, 1393, 1395, 1398-99, 1405, 1409, 1411-12, 1414, 1435, 1438-9, 1443, 1452-54, 1456),

depression (Tr. 1389, 1449, 1450, 1452), exertional chest pain (Tr. 1391),  peptic ulcer disease (*id.*,

1409, 1412, 1443-44), constipation (Tr. 1393, 1409, 1439), left wrist tendonitis (Tr. 1403), erectile

dysfunction (Tr. 1411-12, 1438, 1441, 1452, 1456), obesity (Tr. 1438, 1455), knee strain (Tr. 1440),

abdominal pain (Tr. 1441), hypercholesterolemia (Tr. 1442), headaches (*id.*), back pain (Tr. 1444,

1455), breast soreness (Tr. 1450), and daytime sleepiness due to Sequerol (Tr. 1456).

Dr. Reznik continued to manage Fleener's pain medication in April 2004.  Tr. 1411-12.  On

May 7, 2004, Dr. Reznik formulated a pain management plan for Fleener. Dr. Reznik agreed to

prescribe methadone and Oxycontin indefinitely, as long as Fleener did not ask that the dose be

increased.  Tr. 1410.  Dr. Reznik also asked Fleener to decrease and stop his Klonopin use at this

time.  *Id.*  Dr. Reznik diagnosed chronic pain syndrome, constipation, and nosebleeds, on May 26,

2004.  Tr. 1409.

Dr. Reznik also diagnosed bipolar disorder based on Fleener's reports on May 7, 2004.  Tr.

1410. On this date Fleener and his partner presented together in Dr. Reznik's office.  Tr. 1410.  Dr.

Reznik wrote:

> [Fleener] and his partner stated that they believe he has bipolar.  He
> said he filled out several surveys and on my questioning he does have
> a long history of depression which comes and goes.  He has been

---

[8]The entries in the record for the visits with Dr. Reznik have the appearance of all beginning with a "cut and paste" version of the initial history from Fleener, as distinguished from a newly obtained history or diagnosis by the doctor at each visit.

> under treatment for depression for a long time and they do report a
> prior history of anger as well as some psychotic behavior particularly
> delusional thoughts and beliefs of persecution.  There is a history of
> prior arrests for reckless driving.

Tr. 1410.  Dr. Reznik indicated that he accepted Fleener's report and does not show any additional

mental status examination or testing.  *Id.*

Fleener presented to the Emergency Room on May 28, 2004, by ambulance complaining of

suicidal ideation.  Tr. 1147.  A urinalysis on this date was positive for positive for benzodiazepines,

and negative for opiates.  Tr. 1208.  Admitting physician Dr. Lippy admitted Fleener to the

psychiatric ward and diagnosed depression and dependent traits, with a rule-out diagnosis of bipolar

disorder.  Tr. 1147.  Dr. Lippy noted that Fleener appeared focused upon somatic illnesses.  *Id.*

Fleener reported by telephone to treating Dr. Reznik that he was in a psychiatric ward on June

8, 2004, and would be there for three more weeks.  Tr. 1407.

On June 18, 2004, Fleener reported recent hospitalization for psychosis and depression to Dr.

Reznik.  Tr. 1405.  Fleener also requested more pain medication at this time, and Dr. Reznik

diagnosed chronic pain syndrome.  *Id.*

Emergency room physician Dr. Histand assessed Fleener's complaints of arm pain on July

5, 2004.  Tr. 1281.  Dr. Histand diagnosed tenosynovitis of the left forearm.  *Id.*  On July 9, 2004,

Dr. Reznik diagnosed tendonitis of the left wrist.  Tr. 1403.  Dr. Reznik performed a follow-up

examination on July 19, 2004.  Tr. 1401.  Dr. Reznik diagnosed chronic pain syndrome on August

4, 2004.

Urgent care physician Dr. Miller performed a consultative examination to address Fleener's

back pain on August 10, 2004.  Tr. 1280.  Dr. Miller suggested a pain cocktail delivered by injection.

*Id.*  On August 30, 2004, Dr. Reznik diagnosed gastritis and chronic pain syndrome.  Tr. 1398.

15 - FINDINGS AND RECOMMENDATION

A September 22, 2004, colonoscopy report showed no gross abnormalities, and physicians diagnosed functional colonic motility disorder. Tr. 1211. A September 24, 2004, abdominal and pelvic CT examination was negative. Tr. 1222-23.

On September 29, 2004, Fleener reported to Dr. Reznik that he was hearing voices and was "interested in" an increased prescription for Seroquel, an antipsychotic medication. Tr. 1397. Fleener also reported at this visit that he had recently been diagnosed with fibromyalgia. *Id.* Dr. Reznik wrote that this diagnosis was made "apparently by Dr. Epstein[9] who possible may be a [psychologist] although I am not sure." *Id.* Fleener attended a follow up appointment for his chronic pain with Dr. Reznik on November 12, 2004. Tr. 1395.

Examining physician[10] Dr. Taylor evaluated Fleener for Disability Determination Services ("DDS")[11] on November 16, 2004. Tr. 1227. Dr. Taylor noted Fleener's report that he fell in 1999, and broke, and Fleener's reports that he had fibromyalgia and "throws up when he eats." Tr. 1228. Dr. Taylor also stated that he observed Fleener "walking briskly" in his office parking lot when he believed he was unobserved. Tr. 1229. In the course of his assessment, Dr. Taylor conducted a clinical examination and reviewed treating physician Dr. Collada's notes and Fleener's OHSU records. Tr. 1227, 1229-31. Based upon Fleener's report and a brief physical examination, Dr. Taylor diagnosed fibromyalgia, bipolar disorder, arthritis, history of splenectomy, history of back fracture, post surgery, pneumonia, history of pericarditis, hand cellulitis, and chronic constipation.

---

[9]The record does not contain any clinical notes from any source identified as Dr. Epstein.

[10]The record does not indicate Dr. Taylor's specialty.

[11]DDS is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 U.S.C. § 421(a) and 20 C.F.R. §§ 404.1503; 416.903.

16 - FINDINGS AND RECOMMENDATION

Tr. 1231. While the record shows that Fleener reported tenderness throughout his back upon examination, Dr. Taylor apparently did not conduct a complete fibromyalgia trigger-point examination. Tr. 1230-31. Dr. Taylor stated that Fleener could stand and walk four hours, sit four hours, lift up to twenty pounds, and rarely stoop, crouch, crawl, or kneel. Tr. 1231-32. Dr. Taylor and assessed no manipulative, visual, communicative, or workplace limitations. Tr. 1232.

On November 29, 2004, Dr. Reznik diagnosed obesity, chronic pain, and constipation. Tr. 1393. Dr. Reznik noted Fleener's report of dyspnea upon exertion on December 10, 2004. Tr. 1391. Fleener had an ECT stress test, with normal results, on December 17, 2004. Tr. 1142. Dr. Reznik again assessed chronic pain and depression on December 22, 2004. Tr. 1389.

### G.    2005

Fleener presented to treating physician Dr. Buckingham to establish care on January 5, 2005. Tr. 1275. Dr. Buckingham noted Fleener's reported history of bipolar disorder, failed L4-S1 fusion, chronic back pain since falling in 1999, fibromyalgia, endocarditis and pericarditis in 2007, and chest pain. Tr. 1275. Dr. Buckingham diagnosed atypical chest pain and a lipid disorder. Tr. 1276.

Fleener received a left heart catheterization, coronary angiography, and ventriculography on January 7, 2005. Tr. 1264. Attending surgeon Dr. Buckingham found normal coronary anatomy, "spasm or nonsignificant stenosis of the right coronary artery of about 40%,", and normal left ventricle function. Tr. 1265.

Dr. Reznik continued to follow Fleener between May 2, 2005, and December 5, 2005. Tr. 1448-1457. At a follow-up examination on February 2, 2005, Dr. Reznik agreed to raise Fleener's Klonopin prescription for Fleener's anxiety if Fleener decreased his methadone dose. Tr. 1385. On this date Dr. Reznik also noted that Fleener had a negative coronary angiography and attributed

Fleener's reported chest pain to Fleener's chronic pain syndrome.  Tr. 1385.  *Id.*

Dr. Reznik performed additional follow up examinations on February 16, 2005, March 17, 2005, and April 15, 2005.  Tr. 1379-83.  During this time Dr. Reznik diagnosed chronic pain syndrome, and noted Fleener's reports of weight gain and auditory hallucinations.  *Id.*  On May 2, 2005, Dr. Reznik stated that Fleener's hallucinations had resolved with Sequerol.  Tr. 1377.

On June 1, 2005, Fleener requested additional pain medication from Dr. Reznik.[12]  Tr. 1455. On October 31, 2005, Dr. Reznik again diagnosed depression and noted Fleener's report of Seroquel side effects.  Tr. 1450.  Dr. Reznik also noted Fleener's report of sleep difficulties on November 14, 2005.  Tr. 1449.

### H.    2006

Dr. Reznik again noted Fleener's failed back surgery syndrome, chronic back pain, peptic ulcer disease, asplenia, fibromyalgia, bipolar disorder, depression, and erectile dysfunction on January 11, 2006.  Tr. 1446.  Dr. Reznik stated that Fleener's pain relief was adequate and that Fleener was gaining weight on January 25, 2006.  Tr. 1445.  Dr. Reznik diagnosed back pain, bipolar disorder, and epigastric pain on February 9, 2006.  Tr. 1444.  On February 23, Dr. Reznik again diagnosed chronic pain syndrome.  Tr. 1443.  On February 27, 2006, a brain CT was normal.  Tr. 1458.

Dr. Reznik additionally noted Fleener's reports of hypersomnolence and a headache on March 6, 2006.  Tr. 1442.  On March 23, 2006, Dr. Reznik noted Fleener's reports of abdominal pain, and on March 31, 2006, noted Fleener's reports of right knee pain.  Tr. 1440-41.  Dr. Reznik continued to follow Fleener in April 2006, diagnosing chronic pain syndrome, erectile dysfunction,

[12]Fleener's request violated his May 2004 agreement with Dr. Reznik, see p. 13, *supra*.

and constipation.  Tr. 1439.  On June 21, 2006, Dr. Reznik stated that Fleener was "doing well," and administered a vitamin B12 injection.  Tr. 1436.

On July 31, 2006, Dr. Reznik again diagnosed chronic pain syndrome and stated that Fleener was "disabled" due to failed back surgery syndrome.  Tr. 1435.  Dr. Reznik diagnosed metabolic syndrome, migraines, and chronic pain syndrome on August 31, 2006.  Tr. 1433.  Dr. Reznik found Fleener's chronic pain disorder secondary to failed back surgery, fibromyalgia, and arthritis.  *Id.*  Dr. Reznik again diagnosed chronic pain and metabolic syndromes on October 31, 2006, (Tr. 1432), and repeated these diagnoses on November 30, 2006.  Tr. 1431.

### I.    2007

Physician's assistant Scott Wagnon diagnosed Fleener with chronic pain syndrome, possible sleep apnea, vitamin B-12 deficiency, and a lipid disorder on January 4, 2007.  Tr. 1430.

### II.   Fleener's Testimony

Fleener completed eleven DDS questionnaires, and testified at both of his hearings.

### A.    Fleener's Questionnaire Responses

#### a.    September 15, 2000, Disability Report

Fleener stated that he was disabled due to hand and back injuries and surgeries, a heart attack, and "post-operative depression."  Tr. 78.  Fleener explained that these impairments limited his ability to work due to numbness in his left hand, shortness of breath, and "extreme pain" in his back, legs, and feet.  Tr. 78.  He stated that he stopped working following injury on December 20, 1999.  *Id.*

#### b.    October 26, 2000, Activities of Daily Living Report

Fleener first stated that he requires help into the shower and putting on his shoes because he cannot bend over.  Tr. 100.  He also stated that "food does not taste the same" since his disabling

condition began, and that will often "vomit after eating." Tr. 101. Fleener reported doing no

housework, and that his roommate handles household finances and shopping. Tr. 101-02. Fleener

next wrote that he has "trouble reading, writing [and] remembering since my heart attack," and that

he now wears glasses. Tr. 103. He also stated that he watches television three hours per day "as I

have to rest," and that he can no longer ride his mountain bike two to three hours per day or perform

yard work. Tr. 103. He further explained that he, "cannot hardly move, walking is a chore alone."

Tr. 104. Finally, Fleener stated that he was "ordered by my doctor not to sit for long periods of time

and if I do I cannot get up without tremendous pain and I need help." *Id.*

### c.    October 26, 2000, Pain Questionnaire

Fleener first wrote that he has "burning aching stinging shooting pain." Tr. 107. He said that

his pain is located in both his hands, though his left hand is worse, and in his lower back, legs, and

feet. *Id.* Any movement causes this pain, including sitting, standing, and walking. *Id.* The pain is

worse with "more movement" and improves when he lies on his back on a soft bed. *Id.*

Fleener stated that he can be up and active for one hour before requiring rest. Tr. 108. In

response to a question asking "are there tasks which you begin and can't finish," Fleener responded,

"the biggest task I have to do is my personal hygiene and it takes all my strength to do it." *Id.*

Fleener also stated that he occasionally takes walks, but that if he walks around the block he is

"ready for bed and out of breath." Tr. 109. Fleener reiterated that he requires help in and out of the

shower and that he never cleans his apartment or does laundry. *Id.*

### d.    May 26, 2004, Disability Report

Fleener completed a second Disability Report in conjunction with his 2004 benefit

applications on May 26, 2004. Tr. 947-57. Here Fleener alleged disability due to "broke back/ heart

attack/ paracarditis [sic], depression, mental, no spleen, persistent pneumonia [and] migraines." Tr. 947. Fleener also stated "I can barely walk, I am on 2 different pain meds and that is just so I can function." Tr. 948.

      **e.**      **March 15, 2005 Function Report**

Fleener completed a second DDS Adult Function Report form on March 15, 2005. Tr. 970-87. Fleener first wrote that, "I get up feeling sick every morning," and that he takes his medication and watches TV, before his wife helps him shower. *Id.* After this, Fleener lies down for a few hours, "often sleeping till late evening." *Id.* Fleener explained that "food doesn't taste good any more," and stated that he has five ulcers and will "vomit everyday." *Id.*

Regarding his personal care, Fleener wrote that needs his wife to help him dress and bathe, and that is head is shaved so that he requires no hair care. Tr. 971. He shaves himself "but it takes me 30 minutes." *Id.* Fleener again stated that "I eat but throw up every meal," and that he uses the toilet but "my bowels are very messed up." *Id.*

Fleener wrote that he needs help taking his medicine because he takes "10 different meds. Tr. 972. He stated that he has "problems with my hands" and that he cannot stand for more than five minutes. *Id.* Fleener indicated that he does no household chores (*id.*) because he can "barely walk." Tr. 973. He goes out on his deck every day, and rides in a car to medical appointments only. *Id.* Here Fleener explained that he cannot go out alone because "I fall down a lot [and] I get very dizzy." *Id.* There are no other reports about this, nor any record of a report to a provider of a specific fall. Fleener indicated that he can pay bills, count change, handle a savings account, and use a checkbook or money orders, "but it is very stressful for me at this time." *Id.*

Regarding his hobbies and interests, Fleener wrote that he likes to watch TV "since I am so

ill," and that he is "very crippled up and I am barely able to walk." Tr. 974. He stated that he requires his wife's help to go places, *id.*, and that he doesn't go out "because of my chronic pain [sic] its just too hard to walk." Tr. 875.

Fleener indicated that he is limited in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing. Tr. 875. He also indicated limitations in memory, completing tasks, concentrating, understanding, following instructions, and in using his hands. *Id.* He then concluded that he "keep[s] getting worse and not better [sic] I often feel like I am dying." *Id.*

Finally, Fleener wrote that he can walk one thousand feet, and must rest twenty minutes before resuming walking. *Id.* He indicated that he can pay attention for thirty minutes, follows written instructions "fairly well," but finds spoken instructions "too stressful." *Id.*

### f.    March 15, 2005, Disability Appeal Report

Fleener completed a third disability report in conjunction with his appealed application on March 15, 2005. Tr. 981. He wrote that, as of March 11, 2004, his fibromyalgia is "progressingly getting much worse as well as my back pain." *Id.* He stated that he had new conditions as of March 11, 2004, including fibromyalgia, peptic ulcer disease, bipolar disorder, and chronic pain syndrome. *Id.*

Regarding his activities and personal needs, Fleener wrote, "I am much bed [ridden] every day and I cannot shower by myself." Tr. 995. He also stated, "I need help" and that he "cannot bend over and I often fall down. Soon I will need a walking device." *Id.* Finally, he wrote that his "personal care has gotten much worse because of pain." *Id.*

///

22 - FINDINGS AND RECOMMENDATION

### g.    March 12, 2005, Pain Questionnaire

Fleener completed an additional DDS pain questionnaire on March 12, 2005.  Tr. 989-95.
Fleener wrote that he has "burning stinging aching sharp stabbing pain every second of eery day,"
and that it is mostly in his lower back, buttocks, and legs.  *Id.*  He stated that he has this pain "all day
everyday," that it "never goes away," that he again has pain "every second of every day," and that
his pain is caused by sitting, sleeping, and lying down.  *Id.*  Fleener wrote that getting up from lying
down makes his pain worse.  *Id.*  Fleener indicated that he takes both Methadone and Percocet three
times daily for his pain (Tr. 990), and that these medications give him little relief.  Tr. 989.  Fleener
stated that medication side effects include "heavy sedation," as well as thinking and memory
difficulties, and that physical therapy made his condition worse.  Tr. 990.

Regarding his mobility, Fleener wrote that he can be up and active for one hour before
resting, and that he begins and cannot finish tasks such as shaving.  *Id.*  He stated that he never takes
walks, does no household chores, and his wife must perform his personal grooming.  Tr. 991.

### i.    May 12, 2005, Fatigue Questionnaire

Fleener also completed a Fatigue Questionnaire on May 12, 2005.  Tr. 992-995.  Fleener
stated that he first experienced fatigue after his "first surgery," and that he naps twice a day for four
to seven hours.  Tr. 992.  He stated that he can be up and active one hour before resting, and that he
can barely walk.  *Id.*  Fleener wrote that he requires his wife's help to bathe, does not do household
chores, and cannot finish his personal grooming.  Tr. 993.  On an average day, Fleener indicated that
he sleeps most of the day, watches television, tries to eat, and then goes to bed.  Tr. 994.  Regarding
his mental state, Fleener wrote that he is depressed, anxious, stressed, in severe pain, and cries a lot.
*Id.*  He again stated that his pain medications cause heavy sedation.  Tr. 995.

### j.    May 12, 2005, Function Report

Fleener completed a final Adult Function Report on May 12, 2005.  Tr. 996-1003.  He again stated that he sleeps most of the day and watches television, but that he has a hard time sleeping and experiences nightmares.  Tr. 996.  Fleener wrote that he can't do "everything" and that he can barely walk.  Tr. 997.  He explained that his wife dresses and bathes him, does his hair, shaves him, and has to help him use the toilet.  *Id.*  Fleener said that he feeds himself.  *Id.*  Fleener said that he often forgets to bathe, and that his wife reminds him to take his medications.  Fleener wrote that he cannot stand for any length of time and completes no household chores.  Tr. 998.

Fleener wrote that he cannot go out alone because he requires help getting in a car, and that he doesn't drive because he cannot move his legs.  Tr. 999.  He also indicated that he cannot pay bills, handle a savings account, or use a checkbook, but that he can count change.  *Id.*

Fleener also wrote, "I don't go out much since I broke my back."  Tr. 1001.  Regarding stress, Fleener wrote that he doesn't handle it well and "it will kill me someday."  Tr. 1002.  Finally, Fleener wrote that he was prescribed a cane "right after my accident" and that he will need a cane soon because "my knees are giving out."  Tr. 1002.  He subsequently indicated that he uses a cane at all times.  *Id.*

### k.    August 10, 2005, Disability Appeal Report

Finally, Fleener completed a Disability Report regarding his appeal on August 10, 2005.  Tr. 1017-23.  Fleener wrote that, as of February 2, 2005, his fibromyalgia has "gotten much worse" and that he is bedridden.  Tr. 1017.  He also wrote that "bipolar disorder has taken over my life," and that he had a "heart procedure to clear a blocked artery."  Tr. 1017.  However there are no medical records from this procedure in the record on review.  Fleener stated that his condition is "very bad,"

that he cannot shower by himself, and that he will need a walking device in the "near future" due to his fibromyalgia.  Tr. 1021.   Finally, he stated that he can only sit or stand five minutes because of severe pain.  Tr. 1022.

### B.      Fleener's October 23, 2003, Hearing Testimony

Fleener appeared at his October 23, 2003, hearing by himself and declined representation. Tr. 1488.  Fleener explained that he went to legal aide and was told they would not help him "because the medical facts speak for themselves."  Tr. 1488.

Fleener stated that he was thirty-nine at the time of the hearing, and that he completed two years of college in basic math, business management, and "refresher" courses.  Tr. 1489.  Fleener also stated that he received four years of automotive mechanics training, and has no problems with reading, writing, or simple math.  *Id.*

Fleener testified that he has not worked since December 1999, and that he has "been on my death bed" since that time.  Tr. 1490.  Fleener described impairments relating to failed back surgery, an "infection resulting from my accident," an inability to produce testosterone and vitamin B12, a gallbladder problem, and a recent MRI that showed "severe nerve damage."  Tr. 1490-91.

Fleener also testified that he has constant low back pain, which began in his low back, but now occurs in his upper back.  Tr. 1492-93.  Fleener did not clearly state how much he could lift, but testified that lifting a "pitcher of Kool-Aide" hurts his back.  Tr. 1494.  He testified that he can walk, or "hobble" to the mailbox and the end of his street, and that he must lay down when he returns home.  Tr. 1495.  Fleener said the longest he can stand is for "five to ten minutes."  Tr. 1496.

In response to the ALJ's questioning, Fleener testified that he was not taking anti-depressant medication at the time of his hearing, but that he feels depressed.  Tr. 1496-97.

25 - FINDINGS AND RECOMMENDATION

Regarding activities, Fleener stated that he does not do housework, yardwork, or cooking, but that he runs the washing machine. Tr. 1498. He said that when he goes shopping he leans against a grocery cart for stability, and that "its bed time" when he is finished. Tr. 1499. This appears to contradict Fleener's May 12, 2005, report that he "can't do 'everything'" and cannot stand for any length of time. Fleener testified that his driver's license was suspended due to an unspecified unpaid ticket. *Id.*

Finally, Fleener testified that his only past relevant work was as an automotive detailer specializing in polishing black Porsche and Ferrari cars. Tr. 1503.

### C.    Fleener's March 12, 2007, Hearing Testimony

Fleener appeared at his March 12, 2007, hearing with an attorney. Tr. 1510. Fleener first testified that he was forty three at the time of the hearing, and that he had not worked since age thirty three. Tr. 1515-16. Fleener explained that he specialized in "high line" cars, and that he did not wish to work in a different capacity because he was "picky." Tr. 1517. Fleener also explained that a "jealous" previous girlfriend worked for the Social Security Administration, and reported to the agency that he was performing unreported work. Tr. 1517. Fleener stated that he had forgotten her name. Tr. 1518.

Fleener testified that he completed basic courses at Rogue Community College, and that he drives without a license. Tr. 1519. He also stated that his wife is "mentally disabled." Tr. 1521.

Fleener testified that his disability began on December 20, 1999, because he "fell and broke his back." Tr. 1522.

Regarding his activities, Fleener reported that he uses a motorized cart when shopping, and also has a disabled parking pass, which does not require a driver's license. Tr. 1521. He did not

specify how he reaches the store, but stated that he will "park closer to the store." *Id.* He also stated that he is no longer able to shower by himself, "because of my back being broke." Tr. 1523. Fleener reported that he requires assistance dressing. *Id.* Regarding hygiene, Fleener reported that his wife must assist him in using the toilet, and that he consequently cannot use public restrooms. Tr. 1524. Fleener testified that he can stand about five minutes before sitting or changing positions, and that he can sit about ten minutes. Tr. 1524. Laying down for thirty minutes to one hour alleviates his back pain. *Id.*

Fleener said that he did not have difficulty breathing, and that his attention wanders. Tr. 1525-26. Regarding his medication, Fleener stated that he takes Percocet and Methadone, which cause drowsiness. Tr. 1526. Fleener also said that he was diagnosed with sleep apnea in February 2007, which causes additional fatigue. Tr. 1596-97.

Fleener went on to say that he has had fibromyalgia since 2000, and that it causes "excruciating pain all over." Tr. 1527. Fleener's pain in his legs, ankles, and feet worsens when he sits longer than thirty minutes. Tr. 1527-28. Fleener said that he his depression keeps him from working because he cannot concentrate and his eating is "poor." Tr. 1528. Walking around his 1,000 square foot apartment leaves him breathless. Tr. 1529.

Finally, Fleener stated that he is afraid to leave the house "because I don't have a driver's license, for one," because he has panic attacks "a lot," and because he is depressed. Tr. 1528.

## III. Vocational Expert's Testimony

The vocational expert at Fleener's October 23, 2003, hearing testified that Fleener's past relevant work was as an automobile painter. Tr. 1503. The vocational expert stated that, based upon the ALJ's hypothetical questions, Fleener could perform work as a touch-up screener, cashier, and

27 - FINDINGS AND RECOMMENDATION

ticket seller.  Tr. 1504-05.

At Fleener's March 12, 2007, hearing the vocational expert testified that Fleener could not perform his past relevant work, but that he could work as a small products assembler, food sorter, and garment sorter.  Tr. 1531-32.  The vocational expert stated that if Fleener could not work eight hours a day, five days a week, or missed two or more days of work per month, he would be unable to maintain competitive employment.  Tr. 1532.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act.  20 C.F.R. §§ 404.1520; 416.920, *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If he is, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i).  At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement.  20 C.F.R. §§ 404.1509; 404.1520(a)(4)(ii); 416.909; 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, he is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment medically meets or equals a "listed" impairment in the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).  If the determines that the impairment meets or equals a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  This evaluation includes assessment of the claimant's statements regarding her impairments.  20 C.F.R. §§

404.1545(a)(3); 416.945(a)(3).  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments.  20 C.F.R. §§ 404.1520(e); 416.920(e), Social Security Ruling ("SSR") 96-8p.

The ALJ uses this information to determine if the claimant can perform his past relevant work at step four.  20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  If the claimant can perform his past relevant work, he is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of his past relevant work the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(f); 416.920(a)(4)(v); 416.920(f); *Yuckert*, 482 U.S. at 142; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If the claimant cannot perform such work, he is disabled.  *Id.*

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F.3d at 1098.  If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Id.* at 1100.  If the Commissioner meets this burden the claimant is not disabled.  20 C.F.R. §§  404.1566, 404.1520(g); 416.966; 416.920(g).

## THE ALJ'S FINDINGS

At step one in the sequential proceedings the ALJ found that Fleener had not engaged in substantial gainful activity since his December 20, 1999, alleged onset date.  Tr. 19.  Here the ALJ noted that there is "significant evidence of unreported work activity" since Fleener's alleged onset

///

date, and that "the claimant's life time record of earnings show a work history of only 9 years." Tr. 27.

At step two, the ALJ found Fleener's "status post diskectomy and fusion," fibromyalgia, and mild affective disorder "severe" at step two in the sequential proceedings. Tr. 27. The ALJ found that Fleener does not have a severe cardiac impairment, noting that, despite Fleener's repeated claims, the record shows that he has never had a heart attack. *Id.* At step three, the ALJ found that Fleener's impairments did not medically meet or equal a listed impairment. *Id.*

Between steps three and four the ALJ assessed Fleener's RFC. In this analysis the ALJ found Fleener not credible, citing his contradictory statements and physician observations. Tr. 19-33. Based upon his evaluation of Fleener's credibility and the medical evidence, the ALJ found that Fleener retains the following RFC:

> [A] light residual functional capacity modified by being limited to work which is simple, 1-3 step unskilled work due to possible side effects of prescribed medications, work with limited public interactions to those involving brief and superficial contact, and limiting climbing or stooping to occasional.

Tr. 28. At step four, the ALJ found that Fleener could not perform his past relevant work as an auto detailer. Tr. 33-34. At step five in the sequential proceedings the ALJ found that Fleener may perform work in the national economy as a small product assembler, food sorter, or garment sorter. Tr. 34-35. The ALJ therefore found Fleener not disabled at any time through the date of his decision. *Id.*

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42

U.S.C. § 405(g); *Batson v. Commissioner for Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)(citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The reviewing court may not substitute its judgment for that of the Commissioner. *Id.* (citing *Robbins v. Social Security Administration*, 466 F.3d 880, 882 (9th Cir. 2006)), *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Id.*, *see also Batson*, 359 F.3d at 1193.

## DISCUSSION

Fleener challenges the ALJ's evaluation of treating physician Dr. Suckow, and examining psychologists Drs. Bryan and Gordon. Fleener also contends that the ALJ erroneously rejected his testimony that he must "lie down to relieve pain." Pl.'s Opening Br. 10. Finally, Fleener contends that the ALJ failed to consider his "psychologically based pain." *Id.* at 11.

Fleener attaches additional evidence, dated June 21, 2009, to his Reply Brief. Docket # 14. This court reviews only the record before the Commissioner and will not consider this new evidence.

## I.    Fleener's Credibility

Fleener does not challenge the ALJ's credibility assessment. However, he asserts that the ALJ should have credited his testimony that he must lie down to relieve pain. Pl.'s Opening Br., 10. Fleener's only support for this claim cites SSR 96-7p, which instructs the ALJ in credibility determinations.

The ALJ made detailed findings regarding Fleener's credibility, citing many instances of Fleener's inconsistent statements, which are voluminous. Many of these statements are set out

above.  The ALJ's credibility findings also discussed Fleener's activities of daily living and Fleener's medical record.  Tr. 28-33.

### A.    Credibility Standard

Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter,* 504 F.3d at 1036 (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F.3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  Once a claimant establishes an impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F.3d at 883.

### B.    Credibility Analysis

The ALJ discussed the many inconsistencies in Fleener's statements to the record.  Tr. 29-33.  These instances pertain to Fleener's medical record including his historical reports to medical treatment providers, and his activities of daily living.  The ALJ may consider both in his credibility analysis.  *Lingenfelter*, 504 F.3d at 1040, *Smolen*, 80 F.3d at 1284.

### a.     Inconsistent Testimony: Medical Record

### i.          Inability to Eat

The ALJ first noted that, while Fleener claims he cannot eat due to depression, treating physician Dr. Reznik found Fleener "obese" and instructed him to lose weight. Tr. 29. The ALJ concluded, "too depressed to eat? I think not." *Id.* The ALJ also noted a January 2004 episode where Fleener claimed to be so sick while hospitalized that he threw up food and showed it to the nurse, but was later observed by nursing staff to eat the same food he allegedly threw up. Tr. 30.

The record supports the ALJ's finding. Dr. Reznik repeatedly noted Fleener's obesity and urged him to lose weight. Tr. 1437-39, 1441-42, 1445-56. Fleener's February 4, 2004, hospitalization record also reflects the ALJ's description of his behavior regarding hospital food. Tr. 1127. The record thus supports the ALJ's reasoning regarding Fleener's alleged inability to eat, and this finding should be affirmed.

### ii.         Inconsistent Behavior While Hospitalized

The ALJ found that Fleener reported to the Emergency Room on September 17, 2003, "writhing in pain," but noted that hospital staff subsequently "observed the claimant was resting quietly and appeared to be comfortable. The next moment, when a hospital staffer entered the room the claimant started to moan out loud while grasping his chest." Tr. 30. The ALJ found that this behavior undermined Fleener's claim of a pain disorder (*id.*), inferring that Fleener's presentation was deliberately misleading, rather than genuinely experienced nonorganic pain.

The record reflects the ALJ's citation and description. Tr. 372. This court may affirm an ALJ's credibility determination based upon "inferences reasonably drawn." *Batson*, 359 F.3d at 1193. I find the ALJ's inference that Fleener exhibited pain in a factitious manner based upon the

record.  Indeed several doctors had similar opinions.  The ALJ's citation to Fleener's inconsistent behavior while hospitalized in finding Fleener not credible should therefore be affirmed.

### iii.    Alleged Neurological Deficits

The ALJ found that Fleener alleged "significant neurological symptoms" which were unsupported by the record.  Here the ALJ noted normal neurological examination conducted by Dr. Taylor on November 16, 2004 and Dr. Burchiel in 2001.  Tr. 30.  The ALJ specifically cited Dr. Taylor's observation of Fleener walking "briskly" in the parking lot prior to his examination.  *Id.* The record supports this finding:   on July 31, 2000, neurosurgeon Dr. Brett found no neurological deficits (Tr. 1044) and on September 13, 2001 neurologist Dr. Burchiel also found no neurological deficit.  Tr. 1087.  Furthermore, the ALJ accurately noted Dr. Taylor's observation of Fleener's behavior in the parking lot.  Tr. 1229.

The record also contains lumbar radiculopathy diagnoses made by treating physicians Dr. Sabo and Gillipse based upon Fleener's reports of numbness and pain in his legs.  Tr. 194, 282.

While the ALJ must ordinarily give greater weight to a treating physician's opinion, *Lester*, 81 F.3d at 830, he may reject physician opinions unsupported by clinical notes or findings.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  Here the court notes that neither Dr. Sabo, nor Dr. Gillipse based their radiculopathy diagnoses upon imaging studies, but rather on Fleener's reported history.  Tr. 194, 282.  Additionally, the ALJ must "generally" give more weight to specialist opinions.  20 C.F.R. §§ 404.1527(d)(5); 416.927(d)(5).  Under this standard, the ALJ appropriately gave greater weight to the findings of Drs. Burchiel and Taylor.  The ALJ's conclusion that Fleener's alleged neurological symptoms are unsupported by the record should be affirmed.

///

34 - FINDINGS AND RECOMMENDATION

iv.      Fibromyalgia

Regarding Fleener's fibromyalgia diagnosis, the ALJ found that he had "little or no medical follow-up." Tr. 32.  Indeed there is no properly supported diagnosis of fibromyalgia in the record. The ALJ may cite a claimant's conservative treatment in rejecting a claimant's testimony regarding the severity of an impairment.  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007).

While the ALJ accepted Fleener's fibromyalgia impairment[13] at step two in the sequential proceedings (Tr. 27), the record before this court contains no trigger-point testing establishing a fibromyalgia diagnosis.  Treating physician Dr. Reznik listed by history from Fleener a fibromyalgia diagnosis in a "cut and paste" repetitive fashion between January 6, 2004 and April 15, 2005.  Tr. 1377, 1379, 1381, 1387, 1389, 1391, 1393,1435, 1436, 1437-39, 1441-46, 1448-54, 1456-57. However, Dr. Reznik never explained this diagnosis, nor did he document any trigger-point testing to verify it.  It is not clear that Dr. Reznik ever adopted this diagnosis as his own.  Fleener also reported a fibromyalgia diagnosis to examining physician Dr. Taylor on November 16, 2004 (Tr. 1228), again without identifying who made that diagnosis.  Dr. Taylor subsequently listed a fibromyalgia diagnosis by history from Fleener, but recommended no treatment.  Tr. 1231.  The ALJ's finding that the record contains "little to no medical follow up" regarding Fleener's fibromyalgia (Tr. 32) is based upon the record.  This is an acceptable reason to question Fleener's

[13]Here the ALJ gave Fleener the benefit of the doubt, accepting his reports of fibromyalgia to Dr. Reznik.  Tr. 27.  The court questions the validity of these findings because they are based upon Fleener's reported history, without trigger-point examination under the standards set forth by the American College of Rheumatology.  *See* www.rheumatology.org/publications/classification/ fibromyalgia/fibro.asp (1990 criteria for the classification of fibromyalgia) (last visited November 24, 2009); www.rheumatology.org/publications/classification/ fibromyalgia/1990_criteria_for_Classification_Fibro.asp (entire report of multicenter criteria committee) (last visited November 24, 2009).

credibility, *Parra*, 481 F.3d at 751, and this finding should be affirmed.

Additionally, the ALJ did not attribute any specific work-related limitations to Fleener's fibromyalgia. The ALJ limited Fleener to "simple, 1-3 step unskilled work due to possible side effects of prescribed medication." Tr. 28. Fleener received narcotic medication for a wide variety of his complaints (back pain, chest pain, hand pain, and fibromyalgia). *Supra*. Fleener does not presently assert that the ALJ omitted limitations stemming from his fibromyalgia, and the ALJ's rejection of Fleener's testimony regarding his fibromyalgia should also be affirmed for this reason.

### v.    Other Alleged Impairments

The ALJ noted that objective medical testing ruled out brain, cardiac, and chest impairments. Tr. 32. This finding is based upon the record. A claimant must show by objective medical evidence that he has a "severe" impairment before the ALJ is obliged to provide specific, clear and convincing reasons for rejecting the claimant's testimony addressing symptoms stemming from the alleged impairment. *Lingenfelter*, 504 F.3d at 1036.

Fleener had normal brain MRI and CT studies on March 17, 2003 (Tr. 302, 368) and February 27, 2006. Tr. 1458.

Regarding his alleged cardiac impairment, an emergency room physician noted Fleener's report of past symptoms consistent with endocarditis on April 22, 2002. Tr. 405. On March 14, 2003, treating physician Dr. Gillipse noted that Fleener's Holter monitor study showed no significant artifact. Tr. 284. Emergency room intake notes stated that Fleener had a "recent diagnosis of possible pericarditis" on March 14, 2003. Tr. 351. A chest CT and X-ray on September 17 and September 18, 2003, showed no cardiac abnormalities. Tr. 297-98. A cardiac laboratory study on the same date, showed normal left ventricular function and no pericarditis. Tr. 340. A chest X-ray

on September 19, 2003, showed no acute cardiopulmonary disease. Tr. 374. Treating physician Dr. Collada noted that records from physician Dr. Yeager showed no evidence of a heart attack. Tr. 1141. Finally, a January 10, 2005, angiography showed normal coronary anatomy and left ventricle function with insignificant proximal stenosis of the right coronary artery. Tr. 1265.

Regarding Fleener's chest pain, the record repeatedly shows that Fleener had normal chest studies with no significant abnormalities. Tr. 206, 295, 301, 369, 374, 1094, 1121.

The ALJ's finding that Fleener did not have a brain, cardiac, or chest impairment is based upon substantial evidence. An ALJ must provide "specific, clear and convincing" reasons for rejecting a claimant's symptom testimony where the claimant has established an impairment. *Lingenfelter*, 504 F.3d at 1036. Here, Fleener has not established that he has brain, cardiac, or chest impairments. The ALJ's rejection of his related testimony should therefore be affirmed.

### vi.    Narcotic Medication Use

Finally, the ALJ's discussion of the medical evidence in his credibility findings noted evidence that Fleener was not taking prescribed narcotic medication. Tr. 33. The ALJ may cite a claimant's failure to follow treatment in finding a claimant not credible. *Smolen*, 80 F.3d at 1284; SSR 96-7p at *7. The ALJ found that Fleener's disuse of narcotic medication undermined the degree of pain Fleener alleged. *Id.* Here the ALJ cited a May 28, 2004, urinalysis which should have confirmed that Fleener was taking Percocet and methadone as prescribed. *Id.* The ALJ noted that these test results were negative for opiates and positive for Klonopin, which the ALJ noted that Fleener's treating physician had instructed him not to take. *Id.* The record confirms this finding. Tr. 1208, 1410.

In summary, the ALJ appropriately cited the medical record in finding Fleener not credible.

37 - FINDINGS AND RECOMMENDATION

In conjunction with other findings, the ALJ may rely upon the medical record and physician observations in finding a claimant not credible. *Smolen*, 80 F.3d at 1284. The ALJ appropriately relied upon the observations of Dr. Taylor, as well as hospital staff workers, and the medical records, in the first prong of his credibility analysis.

### b.    Inconsistent Testimony: Activities of Daily Living

The ALJ's credibility analysis also relied upon Fleener's inconsistent statements regarding his activities of daily living. The ALJ may rely upon a claimant's inconsistent statements in finding a claimant not credible. *Smolen*, 80 F.3d at 1284.

The ALJ first stated that Fleener's "fictitious description of his sad existence is internally inconsistent with statements the claimant has made over the years and inconsistent with his daily activities." Tr. 29. The ALJ then cited several inconsistencies in Fleener's reports of his activities of daily living. Tr. 30-31.

### i.    Driving

The ALJ noted Fleener's allegation that his impairments prevent him from driving and Fleener's driving activity, and that Fleener denied driving to examining physician Dr. Gordon. Tr. 20-21.

Fleener told Dr. Reznik on June 21, 2006, that he drives (Tr. 440), and testified at his March 12, 2007, hearing that he does not drive. Tr. 1499. However, Fleener subsequently testified at the same hearing that he drives without a license. Tr. 1519. The ALJ's finding that Fleener gave contradictory testimony regarding his driving activity is based upon the record.

### ii.    Sexual Relations

The ALJ found Fleener's report that his back pain prevents him from engaging in sexual

38 - FINDINGS AND RECOMMENDATION

activity unsupported by the record. Tr. 31.     The ALJ cited  a statement submitted by Fleener's wife and medical records showing that Fleener receives medication related to "male sexual function." *Id.*

Fleener's wife submitted a statement to the record which reads, "No sex in marriage due to his meds and pain on his part."  Tr. 1017.  The ALJ's reliance upon this statement in support of his finding that Fleener made inconsistent statements regarding his back pain and sexual activity is therefore not based upon the record and should be rejected.  Dr. Reznik's treatment notes consistently cite erectile dysfunction between February 2, 2005, and December 5, 2006.  Tr. 1383, 1385, 1403, 1409-12, 1435-39, 1441-46, 1448-54.  Dr. Reznik opined that Fleener's difficulty was caused by his back pain, opiate medication use, and obesity.  Tr. 1412, 1441.  These records are consistent with Fleener's report that his back pain prevented him from engaging in sexual activity. The ALJ's finding regarding the medical record and Fleener's sexual activity is also not supported by the record.

### iii.    Alleged Inactivity

The ALJ also found that the medical record contradicts Fleener's allegation of "nearly total inactivity."  Tr. 31.  The ALJ cited a January 2004 examination showing that Fleener exhibited no muscle weakness or atrophy.  Tr. 31 (citing Ex. B3F/27).  The ALJ's indicated citation corresponds to an August 2000 laboratory report.  Tr. 1047.  However, a neurological examination by neurosurgeon Dr. Brett, contained in the same exhibit cited by the ALJ ("B3F") shows no "objective deficit, with preserved strength, sensation, and myotactic reflexes, and no wasting or fasciculations." Tr. 1045.  The record thus supports the ALJ's finding that clinical observations contradict Fleener's allegation that he is inactive to the point of being bedridden.

39 - FINDINGS AND RECOMMENDATION

### c.    Conclusion: Fleener's Inconsistent Testimony

In summary, the ALJ noted many instances, supported by the record, that show that Fleener made inconsistent statements regarding his symptoms and limitations, his medical record, and his activities of daily living.  The ALJ may cite a claimant's inconsistent testimony in finding a claimant not credible.  *Smolen*, 80 F.3d at 1284, SSR 96-7p at *5.  This court may affirm an ALJ's overall credibility decision where not all of the ALJ's reasons are sustainable.  *Batson*, 359 F.3d at 1197. Therefore, with the noted exception regarding Fleener's sexual activity, the ALJ's reasoning regarding Fleener's inconsistent statements and his credibility should be affirmed.

For all of the reasons above, the ALJ's finding that Fleener is not credible.

## II.    Social Security Ruling 96-7p

Fleener now contends that the ALJ inappropriately dismissed his testimony that he must lie down to alleviate his back pain under SSR 96-7p.  Pl.'s Opening Br. 10.  Fleener also submits that the ALJ failed to consider "that there may be a psychological basis for Plaintiff's pain" under the same Ruling.  Pl.'s Opening Br. 11.

SSR 96-7p is entitled "Evaluation of symptoms in disability claims: assessing the credibility of an individual's statements."  SSR 96-7p (available at 1996 WL 374186).  The Ruling addresses the ALJ's entire credibility analysis, including the standards articulated above.

### a.    Fleener's Alleged Need to Recline Hourly

Fleener does not cite to relevant language supporting his alleged need to lie down under SSR 96-7p.  The Ruling instructs the ALJ to consider a claimant's statements regarding "measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back . . . .).  SSR 96-7p at *3.  The ALJ must consider such measures in conjunction with

other credibility factors, such as a claimant's daily activities. *Id.* As discussed above, the ALJ conducted an adequate credibility analysis, and appropriately concluded that Fleener's testimony regarding his symptoms was not credible. Fleener's present assertion, without pinpoint citation, that the ALJ must credit Fleener's testimony regarding his alleged need to lie down is therefore without merit.

### b. Development of the Record Regarding "Psychological Pain"

Fleener also asserts that the ALJ failed to consider his "psychologically based pain." Pl.'s Opening Br. 11. Fleener cites SSR 96-7p n3, which states:

> The adjudicator must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists, and the individual alleges pain or other symptoms, but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.

SSR 96-7p at *9.

The ALJ found Fleener's "mild affective disorder" severe at step two (Tr. 27), and found that Fleener's alleged bipolar disorder and affective disorder did not meet a listing at step three. Tr. 28. In assessing Fleener's RFC, the ALJ considered Fleener's alleged pain disorder (Tr. 30, 33), his alleged bipolar disorder, and cognitive side effects from his medications. Tr. 32. In response to the Appeal's Council's order to further consider Fleener's alleged mental impairments, the ALJ also discussed Fleener's hospitalization for suicidal ideation and his alleged bipolar diagnosis. *Id.* I find that the ALJ devoted adequate analysis to Fleener's psychological conditions. The voluminous record before this court does not suggest ambiguity regarding Fleener's mental health diagnoses. I therefore find the record sufficiently developed.

///

41 - FINDINGS AND RECOMMENDATION

### III.    Medical Source Statements

Fleener claims the ALJ erroneously evaluated the opinions of treating physician Dr. Suckow and examining psychologists Drs. Bryan and Gordon.

### A.    Standards

Generally, the ALJ must accord greater weight to the opinion of a treating physician than that of an examining physician.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician.  *Id.*, at 830.  The ALJ may reject a physician's opinion predicated upon the subjective complaints of a claimant if the claimant is deemed not credible.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ may not, however, reject physician opinions predicated upon reports of a claimant deemed not credible where independent clinical testing supports the physician's opinion.  *Ryan v. Comm'r*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008).

### B.    Physician Opinions

#### a.    Treating Physician Dr. Suckow and Examining Psychologist Dr. Bryan

The ALJ cited the record exhibit corresponding with Dr. Suckow's opinion ("Ex. B10F"). Tr. 33.  However, the ALJ's discussion of this exhibit  ALJ referred to "Dr. Bryan." Tr. 33.  The court therefore reviews the opinions of both Dr. Suckow and Dr. Bryan.

##### i.    Treating Psychiatrist Dr. Suckow

Fleener asserts that the ALJ "fails to provide any reasons" for rejecting psychiatrist Dr. Suckow's opinion.  Pl.'s Opening Br. 8.

Dr. Suckow diagnosed depression and assessed Fleener's GAF at forty on February 27, 2004. Tr. 1139.   Dr. Suckow assessed Fleener's GAF at forty five on April 19, 2004 (Tr. 1137), and

declined to assess Fleener's GAF on March 18 and March 31, 2004.  Tr. 1132-33.  The ALJ discussed Dr. Suckow's opinion in some detail.  The ALJ first noted Dr. Suckow's depression diagnosis, and found that Dr. Suckow never diagnosed bipolar disorder. Tr. 32.  The ALJ also found Dr. Suckow's GAF assessment unsupported by his treatment notes.  *Id.*

The ALJ noted that a GAF of forty implies that a claimant has "lost his grip on reality" or has a "major impairment in one of the principle areas of functioning."  *Id.*  The ALJ did not provide a citation, but the *Diagnostic and Statistical Manual* ("DSM") explains that a GAF of forty corresponds to "Some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work . . . )."  American Psychiatric Association, *Diagnostic and Statistical Manual*, 4th Ed. Text Revision (2002), 34.

Dr. Suckow's notes do not reflect the degree of impairment described in the *DSM*.  Though the ALJ may not substitute his own judgment for that of a physician.  *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)(hearing examiner, not qualified as a medical expert, should not go beyond the record to make his own assessment of the claimant's condition), the ALJ's finding that a GAF of forty corresponds to a disassociation from reality or major impairment of functioning is correct.  The ALJ's subsequent reasoning that Dr. Suckow's GAF analysis is unsupported by his clinical record is therefore correct. The ALJ may reject a physician opinion inadequately supported by clinical notes or findings.  *Bayliss*, 427 F.3d at 1216.  For these reasons, the ALJ properly rejected Dr. Suckow's GAF analysis.

///

43 - FINDINGS AND RECOMMENDATION

ii.        **Examining Psychologist Dr. Bryan**

Fleener also asserts that the ALJ erroneously found that Dr. Bryan's opinion was not supported by clinical testing, and subsequently inappropriately rejected Dr. Bryan's opinion. Pl.'s Opening Br. 9. The ALJ rejected Dr. Bryan's pain disorder diagnosis and GAF analysis because they were "not based on any psychological testing conducted by Dr. Bryan. The evaluation was entirely based on what the claimant told the psychologist. Since the claimant . . . is not a reliable source of information, I reject Dr. Bryan's opinion as to the claimant's degree of mental impairment." Tr. 33.

The record shows that Dr. Bryan conducted a clinical interview, an intelligence test, memory tests, a "McGill Pain Inventory," and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). Tr. 228. Dr. Bryan wrote that Fleener's McGill Pain Inventory test showed "extreme emphasis on subjective pain," and that Fleener's MMPI-2 testing showed "extreme elevation . . . on a scale relating to somatic distress and concern for health issues, consistent with his emphasis on physical pain and immobility. This is likely in excess of his actual condition and represents a defensive style." Tr. 233. Dr. Bryan diagnosed a pain disorder and a GAF of forty five. Tr. 234. Dr. Bryan's subsequent discussion of these diagnoses does not indicate that he explicitly omitted clinical test results from his diagnostic assessments. Tr. 235.

The ALJ may reject physician opinions predicated upon reports of a claimant appropriately found not to be credible. *Tonapetyan*, 242 F.3d 1149. However, an ALJ may not reject a psychologist's testing where the record does not suggest that the psychologist himself disbelieved the claimant. *Ryan*, 528 F.3d at 1200. Here, Dr. Bryan's test results depended upon Fleener's self-reporting. Dr. Bryan stated that Fleener was likely to "misinterpret and overemphasize physical signs and pain symptoms." Tr. 235. Although Dr. Bryan did not conclude that Fleener

misrepresented himself, Dr. Bryan's report indicates awareness that Fleener misinterpreted his medical history in making his reports. One good example of this is Fleener's report of a "heart procedure clearing a blocked artery" (Tr. 1017) in contrast to the normal angiography in the medical records report. Tr. 1265. Therefore, the ALJ's rejection of Dr. Bryan's report because his testing and subsequent conclusions were based upon Fleener's self reporting should be affirmed.

### b.      Examining Psychologist Dr. Gordon

Dr. Gordon examined Fleener for DDS on September 15, 2004. Tr. 466. Dr. Gordon found that Fleener "does appear to exaggerate his symptomology," but found Fleener's presentation "consistent with bipolar disorder." Tr. 470. Dr. Gordon formally assessed a pain disorder, bipolar disorder, and dependent and paranoid features. Tr. 470. Dr. Gordon based these diagnoses upon Fleener's report and clinical interview. Tr. 466-70. Dr. Gordon noted Fleener's "apparent inability to work" based upon Fleener's reports. Dr. Gordon concluded that, at times, Fleener "is likely to have difficulty remembering and carrying out even simple instructions due to his focus on his pain and his physical symptomology," but made no other work-related restrictions. Tr. 470.

The ALJ first noted that Fleener made contradictory statements regarding his driving activity to examining psychologist Dr. Gordon and his treating physician. Tr. 30. The ALJ also noted Dr. Gordon's diagnoses of a pain disorder and bipolar disorder, and stated that Dr. Gordon "acknowledged the claimant was clearly exaggerating his symptoms." Tr. 32. The ALJ did not explicitly reject Dr. Gordon's opinion, although he did not find any alleged bipolar impairment "severe." Tr. 28.

Fleener first infers that Dr. Gordon opined that Fleener would have difficulty following workplace instructions due to his bipolar diagnosis. Pl.'s Opening Br., 9. The record flatly

contradicts this inference: Dr. Gordon clearly stated that any workplace difficulties Fleener would experience are attributable to his "focus on his pain and physical symptomology." Tr. 470. Fleener fails to establish any work-place limitations stemming from Dr. Gordon's bipolar diagnosis.

Fleener also asserts, without citation, that the ALJ's reference to Fleener's exaggeration was an insufficient reason to reject Dr. Gordon's opinion regarding his workplace limitations. Pl.'s Opening Br. 9. As noted, an ALJ may reject physician opinions predicated upon complaints of a claimant appropriately deemed not credible. *Tonapetyan*, 242 F.3d at 1149. The ALJ's assessment of Dr. Gordon's opinion directly cited Dr. Gordon's report of Fleener's "exaggeration." Tr. 32. This reference is based upon the record. Tr. 470. While the ALJ may not reject a psychologist's opinion where the record indicates that the psychologist believed he claimant and made independent clinical findings, *Ryan*, 528 F.3d at 1200, this court must affirm an ALJ's inference reasonably drawn from the record. *Batson*, 359 F.3d at 1193. The ALJ's inference that Dr. Gordon's diagnostic conclusions relied upon Fleener's less-than-credible reporting should be affirmed. Consequently, the ALJ's citation to Fleener's "exaggeration" in rejecting Dr. Gordon's opinion should be affirmed.

The ALJ may also give less weight to an examining physician's opinion that is inconsistent with that of a treating physician. *Lester*, 81 F.3d at 831. Here, the ALJ found Dr. Gordon's opinion inconsistent with treating psychiatrist Dr. Suckow's opinion that Fleener had depression, but did not have a bipolar disorder (much less any work-related limitations from an alleged bipolar disorder). This is also an adequate reason to reject Dr. Gordon's opinion.

The ALJ therefore appropriately cited Fleener's "exaggeration" and Dr. Suckow's opinion in rejecting Dr. Gordon's bipolar diagnosis. This finding should be affirmed.

///

46 - FINDINGS AND RECOMMENDATION

### c.    Conclusion: Medical Source Statements

Fleener makes one final argument regarding medical source statements: "The ALJ did accept the opinions of numerous non-examining doctors and other physician's assistants. One example is that he accepted the GAF of 54, given by Glenn D. Koppang, MA over the GAF assessed by the three treating and examining doctors." Pl.'s Opening Br. 10 (citing Tr. 1476). The ALJ noted Fleener's March 30, 2006, GAF assessment of fifty four. Tr. 32. Because Fleener provides no explanation of error, argument, or citation to the ALJ's decision relating to this reference it will not be addressed.

## CONCLUSION

The ALJ properly found Fleener not credible, except as noted. This court may affirm an ALJ's overall credibility determination even where, as here, a single reason is not upheld, but the vast majority of reasons given by the ALJ are affirmed. *Batson*, 359 F.3d at 1197. The ALJ also properly evaluated the medical evidence now challenged by Fleener. For these reasons the ALJ's decision should be affirmed.

## RECOMMENDATION

The Commissioner's decision that Fleener did not suffer from disability and is not entitled to benefits under Titles II and XVI of the Social Security Act is based upon correct legal standards and supported by substantial evidence. The Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due December 9, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due December 23, 2009. When the response is due

or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

DATED this 24th_____ day of November, 2009.

  Dennis James Hubel   
Dennis James Hubel
United States Magistrate Judge

48 - FINDINGS AND RECOMMENDATION